Mark PEARSON, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 681S156.

Supreme Court of Indiana.

Nov. 12, 1982.

Don R. Darnell, Newport, for appellant.

Linley E. Pearson, Atty. Gen., Janis L. Summers, Deputy Atty. Gen., Indianapolis, for appellee.

HUNTER, Justice.

The defendant, Mark Pearson, was convicted by a jury of rape, a class A felony, Ind.Code § 35–42–4–1 (Burns 1979 Repl.), burglary, a class A felony, Ind.Code § 35–43–2–1 (Burns 1979 Repl.), and battery, a class C felony, Ind.Code § 35–42–2–1 (Burns 1979 Repl.). He was sentenced to consecutive terms of imprisonment of thirty years on each of the class A felonies and to a concurrent term of five years on the class C felony. He has raised eleven issues in his direct appeal which we have consolidated into the following eight issues:

1. Whether the trial court erred in denying defendant's motion to suppress and permitting the victim to testify after she had undergone hypnosis for the purpose of refreshing her memory of the events of the crime;

2. Whether the trial court erred in excluding certain photographs from evidence at the hearing on defendant's motion to suppress;

3. Whether the trial court erred in denying defendant's motion for a continuance when one of defendant's witnesses was unavailable;

4. Whether the trial court erred in granting the state's motion in limine which prohibited any mention to the jury of potential penalties defendant might face;

5. Whether the trial court erred in admitting into evidence a waiver of rights form signed by defendant and certain photographs taken of him following his arrest;

6. Whether the trial court erred in refusing to give four of defendant's tendered instructions;

7. Whether the trial court erred in overruling defendant's motions for directed verdict; and

8. Whether the trial court erred in sending certain exhibits into the jury room during deliberation.

A brief summary of the facts from the record most favorable to the state shows that the victim was attacked by a masked intruder in the living room of her trailer home on the evening of October 2, 1980. The assailant hit her over the head several times, tried to choke her and threatened to kill her because she had hurt one of his friends. He forced her into the bedroom where he raped her. The victim testified that she recognized the assailant's voice as being defendant's voice since he had lived next door to her for three years. At one point, the assailant pulled the mask up over part of his face in order to kiss her and she was able to observe the lower part of his face. She said she felt whiskers and a mustache when she tried to push him away. She told police immediately after the incident that she was sure defendant was the person who had attacked and raped her because of his voice and comments he made about where she worked. Defendant testified at trial and denied all of the allegations against him and said that he had never been inside the victim's trailer.

Eighteen days after the instant crime, two police officers, one of whom was the investigating officer assigned to the case,

conducted a hypnotic interview with the victim in order to refresh her memory of the incident and see if she could remember any further details. At this interview, she was shown pictures of defendant as he appeared when he was arrested. Defendant made a pretrial motion to suppress the victim's testimony and presented evidence that the victim's memory of the incident had been contaminated and altered because of the hypnotic interview. He argued that any testimony from her memory would be incompetent, irrelevant, and prejudicial and presented expert testimony in support of his contention. However, the trial court overruled the motion to suppress, and the victim was subsequently allowed to testify at the trial.

I.

█ The issue of the admissibility of testimony from a previously hypnotized witness may arise in a variety of different contexts and must be treated according to the circumstances of the individual case. We have clearly held, along with a majority of other jurisdictions, that evidence derived from a witness while he is in a hypnotic trance is inherently unreliable and must be excluded as having no probative value. *Strong v. State*, (1982) Ind., 435 N.E.2d 969, and cases cited therein.

A more complex problem arises when hypnosis is used to refresh the recollection of a witness about certain events and the witness is then asked to testify about those events at trial. Experts generally agree that hypnosis is a reliable investigative tool which can be used to provide valuable leads for investigation, but medical authorities as well as courts have recognized that there is a dangerous potential for abuse when hypnotically recalled memory is used as the basis for courtroom testimony. Unlike the fact finders in the courtroom, the investigator does not need to make subjective evaluations of the truth or falsity of the hypnotic recall but only uses the leads he obtains for the purpose of subsequent investigation and verification. However, when hypnotically refreshed testimony is used in the courtroom, the potential for abuse is great, since the accuracy and reliability of hypnotically-refreshed memory is limited by the characteristics of an individual in the hypnotized state.

It has been well documented that suggestion is a keystone to hypnosis, and hypnotically recalled testimony is often a mixture of fact and fantasy based upon suggestive words or clues used by the hypnotist. It is usually impossible for either the subject or an expert to distinguish between the fact and fantasy even when the subject is brought out of the hypnotic trance. The subject in a state of hypnosis will often unconsciously create answers to the questions which the hypnotist asks if he cannot recount the details being sought. This process of filling in the gaps of memory with fantasy has been called confabulation. As one expert in the field has stated:

"Two salient conditions that usually characterize the person who is in a hypnotic state or trance are *hypersuggestibility* and *hypercompliance*. * * * Thus, the hypnotized individual is not only more easily influenced but is also more highly motivated to please others, most especially the hypnotist and those who are seen as associated with the hypnotist." Levitt, *The Use of Hypnosis to 'Freshen' the Memory of Witnesses or Victims, Trial,* April 1981, at 56.[1]

*See also*: Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 *Cal.L.R.* 313 (1980); Spector and Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?* 38 *Ohio L.J.* 567 (1977); Dilloff, *The Admissibility of Hypnotically Influenced Testimony*, 4 *Ohio Northern L.R.* 1 (1974). Furthermore, medical authorities have found that a hypnotized subject, upon awakening, has a confidence that everything in his memory is factually based and

---

1. Dr. Eugene Levitt is a professor of clinical psychology at the Department of Psychiatry, Indiana University School of Medicine and is director of the section of clinical psychiatry, Department of Psychiatry, Indiana University School of Medicine.

this conviction about the accuracy of his memory cannot be undermined through cross-examination. *Diamond, supra,* at 340; *Levitt, supra,* at 57.

After a careful consideration of both expert testimony and scholary articles on the limitations of the reliability of hypnotically refreshed testimony, other jurisdictions have divided in their treatment of this issue. Some jurisdictions have adopted a rule of total exclusion holding that a previously hypnotized witness is incompetent to testify in a criminal trial about any events which were the subject of the hypnosis. *People v. Shirley,* (1982) 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775; *People v. Gonzales,* (1981) 108 Mich.App. 145, 310 N.W.2d 306; *State v. Palmer,* (1981) 210 Neb. 206, 313 N.W.2d 648; *Commonwealth v. Nazarovitch,* (1981) 496 Pa. 97, 436 A.2d 170; *State v. Mena,* (1981) 128 Ariz. 226, 624 P.2d 1274; *State v. Mack,* (1980) Minn., 292 N.W.2d 764. These courts found that the problems involved with the reliability of hypnotically induced testimony were so substantial that "the game is not worth the candle." *People v. Shirley, supra,* 31 Cal.3d 40, 181 Cal.Rptr. 255, 641 P.2d 787.

However, other courts have found that despite its inherent dangers, hypnotically refreshed testimony could be admitted if certain safeguards on the hypnotic procedure were followed. The safeguards required are generally patterned after those recommended by an expert in the field, Dr. Martin T. Orne, and enumerated by the New Jersey Supreme Court in *State v. Hurd,* (1981) 86 N.J. 525, 432 A.2d 86:

"1. A psychiatrist or psychologist experienced in the use of hypnosis must conduct the session.

"2. The professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense.

"3. Any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form.

"4. Before inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. The hypnotist should carefully avoid influencing the description by asking structured questions or adding new details.

"5. All contacts between the hypnotist and the subject must be recorded.

"6. Only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the post-hypnotic interview." *Id.* 432 A.2d at 96–97.

Similar safeguards have been adopted in other cases. *See, Polk v. State,* (1981) 48 Md.App. 382, 427 A.2d 1041; *People v. McDowell,* (1980) 103 Misc.2d 831, 427 N.Y. S.2d 181; Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int'l J. Clinical & Experimental Hypnosis, 311 (1979).

Finally, still other courts have held that hypnotically-refreshed testimony is admissible and that the problems inherent in its use go to the weight of the evidence. The Supreme Court of Wyoming recently held that the value of the testimony of a previously hypnotized witness could be properly determined by an attack on the witness's credibility. *Chapman v. State,* (1982) Wyo., 638 P.2d 1280. *See United States v. Awkard,* (9th Cir.1979) 597 F.2d 667, *cert. denied* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); *United States v. Narciso,* (D.C.Mich. 1977) 446 F.Supp. 252; *People v. Smrekar,* (1979) 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848; *State v. McQueen,* (1978) 295 N.C. 96, 244 S.E.2d 414; Annot. 92 A.L.R.3d 442 § 8. The Wyoming court set out the six procedural requirements which had been adopted by the New Jersey court in *State v. Hurd, supra,* and then concluded:

"The party proffering the testimony of a previously hypnotized witness may well be advised to fortify the credibility of such witness by complying with some or all of these safeguards, but there are too many variables in hypnotism to mandate such requirements.

\*　　\*　　\*　　\*　　\*　　\*

"An attack on credibility is the proper method to determine the value of the testimony of a previously hypnotized witness. Any one or all of the six points may, or may not, have bearing on the credibility of such witness in a given use." *Chapman v. State, supra,* at 1283, 1284 [footnotes omitted].

█ Recently, the Arizona Supreme Court has modified its previous position of *per se* total exclusion and has held that a witness will not be rendered incompetent because of a hypnotic session but will be permitted to testify with regard to matters which he was able to recall and relate prior to hypnosis. *State ex rel. Collins v. Superior Court,* (1982) 132 Ariz. 180, 644 P.2d 1266, 1279 (supplemental opinion on rehearing). It is evident that our prior Indiana case law supports the position taken by the Wyoming and Arizona courts in finding that the fact of hypnosis should be a matter of weight with the trier of fact but not a *per se* disqualification of the witness. *Forrester v. State,* (1982) Ind., 440 N.E.2d 475; *Strong v. State, supra, Merrifield v. State,* (1980) Ind., 400 N.E.2d 146.

█ The hypnotic session is just one of many factors which can affect a witness. However, since the inherent dangers with the use of hypnosis are now well documented, the careful attorney or investigator should take precautions such as those enumerated in *State v. Hurd, supra,* to protect the credibility of a witness who is subjected to a hypnotic session. Even when the hypnosis is being used only as an investigative tool, the attorney must realize that the use of hypnosis may result in destroying the probative value of the evidence obtained. In every case, the trier of fact must be presented with sufficient evidence to be able to judge the reliability of the witness's perception of the events before the hypnosis session, the manner in which the hypnosis procedure was conducted, and the degree to which the witness's statements were changed by the hypnosis session.

█ In the instant case, the victim did unequivocally identify defendant as her assailant shortly after the incident. This identification was based upon her recognition of defendant's voice, certain remarks he made, his general build, and the shape of his lower face when he briefly raised his mask. She expressed no doubt as to his identity as she had lived in a trailer next to him for about three years. She also did not have any doubts about the major details of the crime. The statement which she gave to the police at the hospital shortly after the incident established the identity of her assailant and the necessary elements of the crime.

The jury had before it the circumstances of the hypnotic session to which the victim was subsequently exposed. In this case, the hypnotic session was very unreliable as few of the advisable safeguards were present. The hypnotist was a state police officer, with some informal hypnosis training, rather than an impartial psychiatrist or psychologist experienced in the use of hypnosis. The police officer investigating the case was also present during the hypnosis session. While the session was tape-recorded, the tapes turned out to be inaudible. There was evidence that improper suggestions were made to the victim during this session, including showing her defendant's picture. Therefore, the jury could infer that the victim's statements which in any way resulted from this hypnotic session were unreliable.

However, the only facts which the victim changed after the hypnosis session were the color of the defendant's shirt, the possibility that he was wearing a hat, and how much of his face she actually saw during the crime. Her identification of defendant and her description of the major incidents of the crime were not changed. The jury was aware of the circumstances of the identification, the procedures used during the hypnosis session, and the changes in the victim's testimony after the hypnosis. The victim was a competent witness with respect to the identification of defendant and the necessary elements of the *corpus delicti* about which she had testified prior to the hypnosis session. The determination of the weight of her testimony was for the jury.

*See Forrester v. State, supra.* We find there was no error in the admission of the victim's testimony and in the trial court's overruling of defendant's motion to suppress and motion to dismiss based on this issue.

## II.

At the hearing on his motion to suppress the victim's testimony, defendant offered in evidence a group of eight photographs alleging that some of them were shown to the victim during the hypnosis session to influence her memory. However, the police officer who conducted the hypnosis session could not identify which pictures had actually been shown to her during that session. It is well settled that the trial judge has wide discretion in ruling on the relevancy of evidence in a criminal proceeding. *Turpin v. State,* (1980) Ind., 400 N.E.2d 1119; *Williams v. State,* (1979) 270 Ind. 573, 387 N.E.2d 1317; *Barnes v. State,* (1975) 263 Ind. 320, 330 N.E.2d 743. Here, the connection between the group of photographs and the hypnosis session was speculative and confusing since there was no evidence as to which pictures were actually used. There was no error in refusing to admit the photographs into evidence.

## III.

One week before the trial in this case, defendant made a motion for a continuance based upon the absence of an expert witness. The witness, Dr. Eugene Levitt, is one of the leading experts on the effects of the use of hypnosis in refreshing the memory of witnesses or victims as we have previously noted in Issue I above. Dr. Levitt was unavailable at the time the instant trial was scheduled because he underwent surgery the day prior to the trial. The trial court denied defendant's motion for continuance and the trial took place as scheduled.

It is well settled that the granting of a motion for a continuance lies within the sound discretion of the trial court. His determination will be reversed only upon a showing of clear error. *Whitacre v. State,* (1980) Ind., 412 N.E.2d 1202; *Minton v.*

*State,* (1978) 269 Ind. 39, 378 N.E.2d 639; *White v. State,* (1975) 263 Ind. 302, 330 N.E.2d 84. In this case, defendant did have one expert witness who testified as to the effects of hypnosis. Defendant has not shown any facts which Dr. Levitt would have been able to provide that were not provided by his other expert. There is no showing of clear error here.

## IV.

Defendant next contends that the trial court erred in sustaining the state's motion in limine which prevented any mention of potential penalties to the jury. This issue has been decided contrary to defendant's position. We have clearly held that the accused in a criminal proceeding has no right to have the jury informed as to potential penalties since the jury does not engage in the sentencing function under our present criminal code. *Smith v. State,* (1982) Ind., 432 N.E.2d 1363; *Comstock v. State,* (1980) Ind., 406 N.E.2d 1164; *Debose v. State,* (1979) 270 Ind. 675, 389 N.E.2d 272.

## V.

Defendant next argues that a waiver of rights form and photographs taken of him after his arrest were erroneously admitted. Defendant was arrested at his parents' trailer and was orally advised of his rights at that time. He was taken to the county jail where he signed the written waiver of rights form and was then fingerprinted and photographed. He argues that his constitutional right to have the representation of an attorney at each step of an investigation or trial was violated when the pictures were taken and he did not have an attorney present. He has not presented any argument in regard to the waiver of rights form and so has waived any error concerning the admission of that form.

This Court has consistently held that the right to counsel attaches at the critical stages of a criminal proceeding and that perfunctory, administrative procedures such as the taking of handwriting exemplars and fingerprints are not such a critical

stage. *Frances v. State,* (1974) 262 Ind. 353, 316 N.E.2d 364. Furthermore, we have clearly held that the constitutional right against self-incrimination protects the accused against testimonial compulsion and not against compulsory submission to purely physical tests such as fingerprinting, body measurements, handwriting, and photographing. *Hollars v. State,* (1972) 259 Ind. 229, 286 N.E.2d 166. We find no error in the admission of these exhibits.

## VI.

■ Defendant next contends that the trial court erred in refusing to give four of his tendered instructions. The first three of these instructions dealt with the presumption of innocence, the burden of the state to prove all of the elements of the crime beyond a reasonable doubt, and variances between the evidence and the material allegations of the charges. We find that the substance of these instructions was covered by instructions given by the trial court. The court instructed the jury on reasonable doubt, the presumption of innocence, and the burden of proof on the state. He also instructed the jury on each element of each offense and explained that the state must prove each element. There was no error in refusing to give defendant's tendered instructions since they were adequately covered by other instructions. *Clemons v. State,* (1981) Ind., 424 N.E.2d 113; *Richmond v. State,* (1979) 270 Ind. 554, 387 N.E.2d 1312; *Toliver v. State,* (1978) 267 Ind. 575, 372 N.E.2d 452.

■ Defendant also tendered instruction No. 8 concerning the testimony of the victim and the possible effects the hypnotic interview would have on the credibility of her testimony. We have clearly held that it is erroneous to give an instruction which singles out one witness's testimony and attacks its credibility. *Beasley v. State,* (1977) 267 Ind. 396, 370 N.E.2d 360; *Hackett v. State,* (1977) 266 Ind. 103, 360 N.E.2d 1000. The trial court properly instructed the jury on their duty to determine the credibility of all witnesses, and there was no error in the refusal of defendant's tendered instruction No. 8.

## VII.

■ Defendant made motions for a directed verdict at the close of the state's case-in-chief and again at the close of all the evidence. Both motions were denied. Since defendant proceeded to put on evidence of his defense after the overruling of his first motion for a directed verdict he has waived any error in that regard. *Chambers v. State,* (1981) Ind., 422 N.E.2d 1198; *Parker v. State,* (1976) 265 Ind. 595, 358 N.E.2d 110.

Defendant argues that since the memory of the victim had been "tainted" by the hypnosis session her testimony was unreliable and did not provide sufficient evidence to support the verdict of the jury. Our standard for reviewing sufficiency claims is firmly established; on appeal the reviewing court does not weigh the evidence or judge credibility. We are constrained to consider that evidence most favorable to the state, together with all reasonable and logical inferences to be drawn therefrom. If there is substantial evidence of probative value to support the conclusion of the trier of fact, the verdict will not be overturned. *Rowan v. State,* (1982) Ind., 431 N.E.2d 805; *Wofford v. State,* (1979) Ind., 394 N.E.2d 100; *Poindexter v. State,* (1978) 268 Ind. 167, 374 N.E.2d 509.

■ We find ample evidence of probative value in the record here to sustain the verdict of the jury. The victim's pre-hypnosis testimony as to the identification of defendant and the main events of the crime was unchanged by the hypnotic session and therefore was of substantial probative value. The victim stated that she found defendant inside her home when she arrived after work although she was sure she had locked the door before leaving. She testified that defendant threatened to kill her, hit her on the head, and raped her. Her testimony was corroborated by the examining physician who found that she had severe cuts and bruises on her face and head. Sperm cells were found in specimens taken from the victim. It is elementary

that where there is sufficient evidence to support the verdict, an earlier ruling denying a motion for directed verdict was proper since a directed verdict is issued only where there is a total lack of evidence on some essential issue or where there is no conflict in the evidence and it allows only an inference in favor of the accused. *Faught v. State,* (1979) Ind., 390 N.E.2d 1011; *Mitchell v. State,* (1978) 268 Ind. 437, 376 N.E.2d 473. The trial court did not err in denying defendant's motions for directed verdict.

### VIII.

Defendant finally contends that the trial court erred by sending certain documents into the jury room during deliberations. At one point during the deliberations, the jury asked to see a picture which had been admitted in evidence. The trial court then sent all the exhibits into the jury rather than just the one exhibit specifically requested. Defendant now complains that seven of the exhibits were prejudicial because they were admitted during the trial for the purpose of impeaching the state's witnesses. These seven exhibits were certain lab reports, case reports, and the probable cause affidavit.

 Defendant correctly states that it is error to permit writings containing prior inconsistent statements of witnesses, which were accepted into evidence for impeachment only, to go to the jury room during deliberation over the defendant's objection. *Thomas v. State,* (1972) 259 Ind. 537, 289 N.E.2d 508. In this case, however, the complained of exhibits were originally entered in evidence for their substantive value and were not limited as to impeachment only. It is clear that the sending of exhibits to the jury room is within the sound discretion of the trial court, when the exhibits will aid the jury in a proper consideration of the case, no party will be unduly prejudiced by the exhibits and the jury could not misuse the exhibits. *Marsh v. State,* (1979) Ind., 393 N.E.2d 757; *Thomas v. State, supra.* Since the exhibits in this case do not create any harmful conflicts in the evidence and defendant has not shown

how they would influence the jury to his prejudice, we find there was no abuse of discretion in sending these exhibits to the jury room.

For all the foregoing reasons, there was no trial court error and the judgment of the trial court should be affirmed.

Judgment affirmed.

GIVAN, C.J., and DeBRULER and PIVARNIK, JJ., concur.

PRENTICE, J., concurs in result with opinion.

PRENTICE, Justice, concurring in result.

I concur in the result the majority reaches upon Issue I. While the record discloses a violation of Defendant's right to counsel at the hypnotic interview, I am convinced that in this case the hypnosis did not alter the prosecutrix's firm belief, which she had previously communicated to the police, that Defendant was her assailant. I cannot join the majority opinion, because it overlooks the violation of Defendant's right to counsel and misinterprets our prior case law in this area.

Defendant was arrested only hours after the incident occurred. The charging instruments bear a filing date of October 3, 1980. Thus, when the prosecutrix underwent hypnosis on October 20, 1980, Defendant's Sixth Amendment right to counsel had attached. *Estelle v. Smith,* (1981) 451 U.S. 454, 469–70, 101 S.Ct. 1866, 1876, 68 L.Ed.2d 359, 373 (cases cited therein). The United States Supreme Court requires the presence of counsel at "critical stages" in the prosecution before trial in order to preserve the accused's right to confront the evidence against him. *Coleman v. Alabama,* (1970) 399 U.S. 1, 7, 90 S.Ct. 1999, 2002, 26 L.Ed.2d 387, 395–96 (cases cited therein) (plurality opinion).

In *United States v. Wade,* (1967) 388 U.S. 218, 228–32, 87 S.Ct. 1926, 1933–35, 18 L.Ed.2d 1149, 1158–60 the Court discussed the dilemma confronting the uncounseled accused at a pre-trial line-up and concluded that such a defendant is wholly unable to

protect himself against improper and suggestive influences, overt or otherwise, which may prompt the witness to make a positive identification. He cannot reproduce a record, the participants in the pretrial confrontation are not likely to be alert for suggestive influences and techniques, and the tension of the event may preclude the accused from detecting abuses as may the rule of impeachment by prior conviction. Consequently, the presence of counsel provides a meaningful opportunity for the accused to cross examine any subsequent in-court identification as it may have been effected by a suggestive out-of-court line-up.

A pre-trial interview of a witness under hypnosis carries at least the same, if not more, potential for extraneous influences to alter the witness' recollections and perceptions of the criminal event than does a line-up. The majority acknowledges the hyper-suggestibility of a hypnosis subject, the subject's predilection to comply with the hypnotist's requests, and the phenomenon of confabulation. More importantly, the majority recognizes that after hypnosis, fact and fantasy harden into fact in the subject's memory, rendering Defendant incapable of exposing the fantasy by cross-examination. Given these characteristics of hypnosis, in a case such as this, where there was but one eyewitness to the event, the use of hypnosis potentially deprived Defendant of the ability to confront the State's evidence. Officer Stateler, the arresting and investigating officer, who was present at the hypnotic interview, underscored the reason for the hypnosis:

"Q. That being the case, why did that hypnotic interview on October 20th take place?

"A. Not to identify her attacker to possibly to come by more information or evidence that would assist in presenting this case to the jury. Possibly, maybe he was wearing a ring or to, one of the things I was interested in is what he did have over his face. That was one of the things. Anything we gained I figured was to our benefit. It wasn't to identify him. We already knew who he was. *It*

*was to convict him."* R. at 608–09. (Emphasis added).

Consequently, when the State hypnotized the prosecutrix, it engaged in a "critical stage" of the prosecution at which Defendant was entitled to have counsel present.

The above mentioned attributes of hypnosis were related at trial by expert witnesses for the defense. Despite this evidence, the majority does not consider its bearing upon Defendant's motion to suppress the prosecutrix's testimony filed before trial, raised again after the prosecutrix related introductory evidence, and raised again after she concluded her testimony. The motion contains multiple grounds, as evidenced by the following allegations:

"5. That no one representing Mark Pearson was present during the hypnotic interview. * * *

"8. That the hypnotic induced memory of (the prosecutrix) by the State of Indiana, with respect to the alleged assault is not sufficiently reliable to merit admission and that permitting her to testify to this memory under the circumstances of this case, would *deny the defendant his rights to confrontation and to cross-examination* given to him by the Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 13 of the Constitution of the State of Indiana. *That any in-court identification of the defendant by the victim would be tainted* by this hypnotic interview by the State of Indiana conducted on October 20, 1980." R. at 132–33. (Emphasis added).

Through paragraphs 5 and 8, this motion sought to suppress the prosecutrix's in-court identification of the defendant. The majority errs in its reliance upon *Forrester v. State,* (1982) Ind., 440 N.E.2d 475 wherein Defendant had raised the effect of hypnosis upon the victim's competency to testify at all as opposed to her competency to make an in-court identification. Thus, the record at bar reveals a violation of the right to counsel, which was timely brought to the trial court's attention.

A violation of the right to counsel is, nevertheless, subject to the constitutional rule of harmless error, which applies here because Defendant's conviction did not hinge upon the prosecutrix's in-court identification. *Compare Hatcher v. State,* (1981) Ind., 414 N.E.2d 561, 566.

Defendant and the prosecutrix lived in adjacent trailers in the same trailer court. Laboratory analysis of evidence recovered from the scene, the prosecutrix's trailer, proved inconclusive about the perpetrator's identity. However, the prosecutrix testified that during the assault, she had bitten her assailant, who was wearing blue jeans, as hard as she could on the inside of his left thigh, above the knee. Shortly after the arrest, Officer Stateler photographed Defendant's left thigh. At trial the photograph was admitted into evidence along with Stateler's testimony that there appeared to be an "abrasion" on the inside of Defendant's left leg above the knee. We note that the photograph depicts a noticeable mark on Defendant's left thigh which could be a bite mark. At trial, Defendant testified that the mark appeared on the day of the offense when the bottom of a fence post hit his leg as he had "jacked" (pulled) the post out of the ground.

At trial Defendant presented an alibi that he left his family's trailer at 11:05 p.m. to visit a friend, Gene (Sherman) Miller, who lived in a nearby trailer. Defendant knocked at the friend's door, waited five (5) minutes without receiving an answer, and returned home. Defendant's father, who had spent the evening with Defendant drinking beer and watching television, testified that his son was gone ten (10) to fifteen (15) minutes. When deposed, he had testified that he did not know when his son had returned.

Defendant and his father remembered the hour that Defendant left the trailer because a television program, "Streets of San Francisco," was coming on. It had been delayed from its usual time of 10:30 p.m. by a special news broadcast. The prosecutrix testified that she had left work, the Beef House Restaurant, located two (2)

miles from her trailer, at about 10:40 p.m. that night, and that she had driven home without stopping. She also testified that her quitting time varied, depending on the dining room in which she worked. Under Defendant's theory, it appears unlikely that he left his trailer before the prosecutrix arrived home. Consequently, he would not have been in her living room behind the drapes when she entered. Defendant's father testified that before 11:05 p.m. Defendant was sitting next to him on the "davenport" when he, the father, heard the prosecutrix's car come into the drive; yet, when Defendant left, ostensibly only a few minutes later, he did not notice the prosecutrix's car parked anywhere. Further, Defendant's friend, Miller, testified that he went to bed at 10:00 p.m. and was not awakened that night. Defendant's credibility probably suffered a shattering, if not fatal, blow when, as a tactical matter, he revealed two prior convictions for breaking and entering both of which had resulted in his being placed on probation.

After the incident, the prosecutrix drove to her boyfriend's house. He was not home, so she telephoned a friend, who summoned the police. They met the police at an ice cream store just outside Covington. The prosecutrix stated that Defendant, identifying him by name, had raped her. She repeated his name again in subsequent statements given to the State Police at a hospital in Danville, Illinois later that morning. This out of court pre-hypnosis identification came into evidence through police officers without objection. *See Dean v. State,* (1982) Ind., 433 N.E.2d 1172, 1185. Clearly the prosecutrix had made up her mind, either during or almost immediately after the incident, that Defendant, with whom she was acquainted, was the person who had attacked her. Under these circumstances, I doubt that any amount of hypnosis, no matter how suggestive, would have changed her mind.

Nevertheless, the hypnosis may have added details, which the prosecutrix could not or did not remember herself. For this reason I cannot join the majority's overbroad

treatment of the use of hypnosis, for it purports to decide cases which are not yet before us and in so doing it misapplies the cases we have already decided. In addition to *Forrester v. State, supra,* the majority misreads *Strong v. State,* (1982) Ind., 435 N.E.2d 969 where we stated:

"Assuming, *arguendo,* that the hypnotic session was impermissibly suggestive, we must, nevertheless, determine whether or not the State demonstrated, through clear and convincing evidence, that the in-court identification of the defendant has a factual basis independent of the hypnotic session." *Id.* at 969–70.

In *Strong* the right to counsel had not attached when the eyewitness was hypnotized; consequently, we required the State to overcome the higher threshold of clear and convincing evidence as a foundation for the admission of her in-court identification. We faced a similar situation in *Merrifield v. State,* (1980) Ind., 400 N.E.2d 146, 149–50. In both cases, the hypnotized witnesses had identified the defendants before the hypnosis in circumstances free from taint. We did not end our inquiry there, however, but also investigated the record to determine if there was clear and convincing evidence of an adequate independent basis for the in-court identifications. In each case we found the required quantity and quality of Evidence. By imposing a higher burden of proof upon the State, we necessarily assumed that the use of hypnosis had altered the witness' memory to some degree. *See Strong v. State, supra.*[1]

In this case, the manner in which the police officer and hypnotist conducted the interview exemplifies why counsel should be present. At trial, the police officer admitted that he had shown photographs to the prosecutrix before she was hypnotized. He was certain that she had viewed photographs of the trailer taken shortly after the incident but did not remember if she had also viewed photographs of the defendant, which the officer had taken shortly after the arrest. Obviously, in a case where the witness has not first identified the perpetrator by name, the sight of photographs of a suspect just before hypnosis could have a devastating impact on the witness' recall. The witness is on the verge of entering an altered state of consciousness in which his or her memory is ultra sensitive to suggestions. At trial, defense counsel adeptly placed evidence before the jury that the prosecutrix remembered the mustache and facial hair of Defendant exactly as depicted in the arrest photographs, whereas she had not remembered them in that detail when she reported the crime. He also presented evidence that she may have changed her recollection of the shirt her assailant wore. After the hypnosis, her recollection of the shirt matched, exactly, the white, insulated "long john" top which Defendant had worn in the arrest photographs. The police officer admitted that when Defendant was arrested in the middle of the night, he appeared to have just arisen from bed, which would explain his having worn the garment.

More importantly, the participants did not record the hypnotic interview. The record refers to tape cassettes, which purportedly contained only a portion of the session. However, they were of such poor quality as to be inaudible. At the very least, counsel's presence would have insured that Defendant would be able, at trial, to challenge the fairness and propriety of the hypnotic interview with more evidence that the mere memory of the victim, who may remember nothing and may not be disposed in his favor, or the testimony of a police officer and a hypnotist, both of whom work for the State and consequently may be unable to furnish a totally neutral account. Additionally, counsel can bring his own recording device to prevent the hazard which occurred here when the tape recorder either mal-

---

1. Additionally, in *Strong,* 435 N.E.2d at 970 n. 1, we noted that *State v. Hurd,* (1981) 86 N.J. 525, 432 A.2d 86, upon which the majority now relies for a deficient "laundry list" of hypnosis guidelines, was not one of the "better reasoned cases." The guidelines therein are purely dicta in an otherwise relatively brief opinion in which the New Jersey Supreme Court correctly upheld the trial court's suppression order because of the overbearance of a police officer during the hypnosis session.

functioned or the microphone was simply not sensitive enough to pick up the conversation.

Finally, this case illustrates the general lack of discretion utilized by the authorities in deciding whether to employ hypnosis. In *Strong, Merrifield,* and this case, the hypnotized witnesses had identified the accuseds, prior to hypnosis, in circumstances which disclosed no taint. Nevertheless, apparently in search of detail, the authorities risked contaminating the strongest evidence they possessed, thereby possibly rendering the State unable to convict a guilty accused.

Hypnosis may be a useful tool in the investigation of crime but its inherently suggestive properties mandate that it not be used regularly and indiscriminately and that it only be used in conjunction with the traditional safeguards that protect the Defendant's right to confront the evidence against him and thereby enhance the truth finding process. Though counsel should have been notified of and been present at the hypnotic interview as a matter of constitutional law, the record discloses that the error was harmless because the prosecutrix had fixed the identity of her assailant by name in her mind at or just after the assault. Therefore, I vote to affirm the judgment of the trial court.